IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JEFFREY WILKE, | ) | 8:11CV435 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

In this social security appeal, plaintiff Jeffrey Wilke ("Wilke") argues that the Commissioner of Social Security committed reversible error in determining that he is not entitled to disability insurance benefits. For the reasons discussed below, the Commissioner's decision is affirmed.

## I. BACKGROUND

On June 29, 2009, Wilke filed an application for disability insurance benefits. (Tr. 85–89, 137–43.) In his application, Wilke alleged that he has been disabled since May 5, 2009. (Tr. 21.) Wilke's application was denied initially and on reconsideration. (Tr. 21, 91–100.) On April 20, 2011, an administrative law judge ("ALJ") issued a decision finding that Wilke was not disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. (Tr. 21–30.) In her decision, the ALJ followed the five-step sequential analysis prescribed by the Social Security

Regulations to evaluate Wilke's disability claim.[1]  *See* 20 C.F.R. §§ 404.1520, 416.920.  The ALJ found as follows:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has not engaged in substantial gainful activity since May 5, 2009, the alleged onset date (20 CFR 404.1571 *et seq*. and 416.871 *et seq*.).

3. The claimant has the following severe impairments: Degenerative disk disease with lumbar stenosis and lumbar facet disease; seizures, controlled with Dilantin; and hypertension (20 CFR 404.1520(c) and 416.920(c)). Claimant is not alleging a mental condition, but the VA has noted alcohol dependence unspecified.

---

[1] The Social Security Administration uses a five-step process to determine whether a claimant is disabled.  These steps are described as follows:

> At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the [residual functional capacity] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he needs to use a cane to ambulate and is limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling. He should avoid concentrated exposure to hazards and vibration.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on August 12, 1963 and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.965).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. The claimant has acquired work skills from past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a), 404.1568(d), 416.969, 416.969(a), and 416.989(d)).

3

> 11. The claimant has not been under a disability, as defined in the Social Security Act, from May 5, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 23–29.) After the ALJ issued her decision, Wilke filed a request for a review hearing with the Appeals Council of the Social Security Administration. (Tr. 8–18.) On October 21, 2011, the Appeals Council denied Wilke's request for review. (Tr. 1–3.) Thus, the ALJ's decision stands as the final decision of the Commissioner of Social Security.

## II. STANDARD OF REVIEW

A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. *Hogan v. Apfel*, 239 F.3d 958, 960 (8th Cir. 2001). "Substantial evidence" is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. *Id.* at 960-61; *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. *See Moad v. Massanari*, 260 F.3d 887, 890 (8th Cir. 2001).

This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992). Issues of law are reviewed de novo. *Olson v. Apfel*, 170 F.3d 820, 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n.2 (8th Cir. 1995).

## III.  DISCUSSION

### A.  Medical History and Opinions

On May 7, 2009, Wilke visited Dr. Kathryn Lazure ("Lazure") at the VA complaining that on May 1, 2009, he experienced back pain after getting out of bed and standing.  (Tr. 291.)  Lazure examined Wilke and found no evidence of red flags and no midline pain.  (Tr. 293.)  She prescribed Valium[2] and advised him to return to the clinic if his symptoms persisted.  (Tr. 294.)

On May 21, 2009, Wilke returned to the VA complaining of back pain.  (Tr. 284.)  Wilke further stated the Valium had worked, but he ran out.  (Tr. 284.)  Dr. Joseph Robinson determined that Wilke had a muscle strain and increased his Valium dose.  (Tr. 286.)  On June 4, 2009, Wilke returned to the VA to follow-up with Lazure.  (Tr. 276.)  Wilke reported that, overall, he was feeling better and that he was able to walk 1/4 mile nightly with his girlfriend.  (*Id*.)  Lazure reviewed results from a magnetic resonance imaging ("MRI") report that was performed on Wilke and noted that it did not provide an explanation for Wilke's back complaints.  (Tr. 279.)  Lazure refilled Wilke's Valium and scheduled him for physical therapy.  (*Id*.)

On June 10, 2009, Wilke visited a physical therapist, Natalie Saas ("Saas"), for an evaluation.  (Tr. 270.)  Two days later, Wilke complained that his back pain had increased from electrical stimulation with a moist heat pack.  (*Id*.)  Saas advised Wilke that therapy usually takes longer than two days to see any decrease in pain and that sometimes an initial evaluation can cause a little more discomfort before a decrease in pain.  (*Id*.)  Wilke stated he did not want physical therapy and wanted to be referred to the pain clinic.  (*Id*.)

---

[2]Valium's generic name is Diazepam.

On July 8, 2009, Wilke returned to the VA complaining of back pain and was examined by Dr. Kelli Peterson and Staff Anesthesiologist Kimberly Haynes-Henson. (Tr. 254.) During the examination, Wilke received eight "trigger point" injections in his thoracic and lumbar paravertebral muscles. (Tr. 256.) He was also scheduled for a lumbar epidural steroid injection for August 12, 2009. (*Id.*; *see also* Tr. 253.)

On July 13, 2009, Wilke called the VA to request a refill of Valium. (Tr. 253.) Woeher denied Wilke's request and stated that Wilke was now on Neurontin[3] and that it was not wise to be on Valium at the same time. (Tr. 254.) Four days later, Wilke returned to the VA complaining of lower back pain. (Tr. 387.) Dr. Sarah Wierda ("Wierda") examined Wilke and determined that his back pain was most consistent with a muscle spasm. (Tr. 391.) Wierda noted that Wilke's "primary" was concerned about prescribing him Valium because he had a history of substance abuse. (*Id.*) She increased Wilke's Neurontin dose to three times a day, gave him a handout on back pain, and advised him to consult physical therapy for his muscle spasm. (*Id.*)

On July 29, 2009, Wilke attended a physical therapy evaluation. (Tr. 384.) The physical therapist set forth, and discussed, a plan for Wilke to undergo physical therapy one to two times per week for four to six weeks. (Tr. 386.) However, Wilke canceled his follow-up appointment on August 3, 2009, and did not show up for his appointment on August 5, 2009. (Tr. 387.)

In August 2009, Dr. Jerry Reed ("Reed"), a Medical Consultant, reviewed Wilke's record and performed a residual functional capacity assessment. (Tr. 345–52.) Reed determined that Wilke could lift 20 ponds occasionally and 10 pounds frequently. (Tr. 346.) He also found that Wilke could stand, walk, and sit, for about six hours in an eight-hour working day. (*Id.*) Wilke could occasionally climb ramps, stairs, ladders, ropes, or scaffolds, and could frequently balance, stoop, kneel, crouch, or crawl. (Tr. 347.) Wilke needed to avoid concentrated exposure to hazzards, such

---

[3]Neurontin is a brand name for Gabapentin.

as machinery and heights. (Tr. 349.) Reed also concluded that Wilke's reported symptoms were out of proportion with the objective findings and were considered less than fully credible. (Tr. 350.)

On September 10, 2009, Wilke visited Dr. Peter N. Piperis ("Piperis") of Advanced Pain Solutions. (Tr. 355.) Piperis examined Wilke and performed a sacroiliac joint injection, which Wilke reported provided relief and helped him sleep better. (Tr. 358.) Later that month, Wilke called the VA to renew his Valium and Hydrocodone. (Tr. 401.) Lazure agreed to provide Wilke with one refill if he would sign a narcotic contract stating that he would only receive narcotics from Lazure or Woehrer. (Tr. 402.) Wilke signed the contract on October 2, 2009. (Tr. 400.)

On December 8, 2009, Dr. Jerry W. Tanner ("Tanner"), a medical consultant, reviewed Wilke's medical records and completed a physical residual functional capacity assessment. (Tr. 437–38.) Tanner reviewed initial evidence as well as updated evidence which showed that Wilke had some limits due to his back pain and seizures. (Tr. 438.) However, Tanner stated Wilke had good strength, station/gait, and no assistive devices. (*Id*.) Tanner affirmed Reed's August 2009 RFC assessment. (*Id*.)

In early May 2010, Wilke underwent another MRI, which revealed that his degenerative disc disease was essentially stable. (Tr. 445.) On May 17, 2010, Dr. Daniel Surdell ("Surdell") examined Wilke, concluding he had mild weakness. (Tr. 473–74.) Surdell discussed the possibility of back surgery, but stated the specifics would be based on further images. (Tr. 474.)

On June 21, 2010, Wilke followed up with Surdell and expressed his desire to consider surgical options. (Tr. 466.) Surdell noted that Wilke's strength was good, but there was some limit to strength testing on Wilke's knee flexion/extension. (Tr. 466–67.) Surdell noted that he would like Wilke to see one of his partners for further evaluation. (Tr. 467.)

On July 20, 2010, Wilke followed up with Surdell's partner, Dr. Peter Lennarson ("Lennarson"). (Tr. 448.) Lennarson examined Wilke and concluded that he was suffering from lumbar spondylosis with lumbar stenosis. (*Id*.) Lennarson stated Wilke would benefit from an injection of his L5-S1 pseudoarticulation. (*Id*.) Regarding the possibility of back surgery, Lennarson stated that Wilke would have to quit smoking because recovery from surgery is markedly decreased with tobacco use. (*Id*.)

On August 4, 2010, Wilke had the injection Lennarson recommended. (Tr. 491–92.) The injection reduced Wilke's pain level from 5 out of 10 to 1 out of 10. (*Id*.) Two months later, Wilke followed up with Lennarson who noted continued improvement over Wilke's baseline and that the shooting pains down Wilke's left side had "pretty much gone away." (Tr. 552.) However, Wilke also stated that he was still considering surgery. (*Id*.) Lennarson suggested surgery would involve a multilevel discectomy and fusion to the L2 through the sacrum or possibly L3 to the sacrum. (*Id*.) Wilke understood he would have to quit smoking completely to proceed with surgery. (*Id*.)

In November 2010, Wilke started regularly attending physical therapy sessions with Annette Laufmann ("Laufmann"). (Tr. 519–36.) On November 17, 2010, Wilke reported no pain on a scale of 1-10 and that he achieved "a lot of relief" with his home treatment. (Tr. 530.) On November 26, 2010, Laufmann noted that Wilke could describe in "minute detail" the location and pattern of his pain between therapy sessions. (Tr. 527.) Laufmann suggested he consider talking to a counselor who could educate him on how to manage his thought process regarding his pain. (*Id*.) On December 8, 2010, Wilke had attended nine therapy sessions in the past 30 days and reported 20% overall improvement in his pain. (Tr. 610–11.) Wilke was hopeful that he would be able to manage his pain without surgery. (*Id*.)

On December 20, 2010, Wilke visited Woehrer, who noted that Wilke's back pain was stable. (Tr. 599, 603.) During the visit, Wilke reported that his uncle died

8

and he was going to Colorado for the funeral and to help his dad clean out his uncle's house and get his affairs in order. (Tr. 599–603.) Two days later, Wilke visited Psychologist Todd Fleischer ("Fleischer") to discuss his chronic pain difficulties. (Tr. 597.) Fleischer did not conduct any formal testing during this session, but did encourage Wilke to read some pain management materials that he provided. (Tr. 598.) At that time, Wilke reported that he was living with his significant other and her three children. (Tr. 597.)

On January 5, 2011, Wilke visited Laufmann for physical therapy treatment and expressed his appreciation for Fleischer's services. (Tr. 593–94.) Laufmann noted that Wilke continued to cite subjective improvement in his mood and pain management, but she was uncertain whether continued intervention would provide further relief. (Tr. 594.) On February 4, 2011, Wilke visited Laufmann again, reporting a "whirlwind week" that included a long shopping trip to Sam's and a large purchase of "500 pounds" worth of merchandise. (Tr. 577.)

Between January 7, 2011, and February 11, 2011, Wilke attended four counseling sessions with Fleischer. (Tr. 573, 575, 579, 592.) On February 4, 2011, Wilke reported a number of ongoing stressors, including that he was now providing child care for his spouse's grandchildren. (Tr. 575.) By February 11, 2011, Wilke reported that he was experiencing some success in managing his stress and reducing both pain behaviors and his focus on pain. (Tr. 573.)

On March 14, 2011, Woehrer responded to a letter from Wilke's attorney regarding his treatment. (Tr. 616–17.) In the response, Woehrer stated:

> Mr. Jeffrey Wilke has significant severe arthritis of his back at multiple levels. He experienced an acute attack of his back pain in May of 2009. He has not been able to work since that time. He has had significant back pain since then.

9

His formal diagnosis is lumbar degenerative disease with spinal stenosis. His prognosis is overall quite poor.

We have tried several treatment modalities to make the back pain better. Medications that he is on for the back pain include Elavil, Gabapentin, Flexeril, Diazepam and Vicodin. He has undergone several back injections (epidurals). He has also went through several courses of Physical Therapy. All with a significant level of back pain. The neurosurgeons have offered him back surgery. He is aware that this may or may not help the back pain if this surgery was done.

These are my answers to your specific questions:
1. Do you believe it is consistent with his medical condition that he can only sit for 15-20 minutes at one time before he needs to stand up or lie down? YES.

2. Do you believe it is consistent with his medical condition that he can only stand for 15-20 minutes at one time before he needs to sit down or lie down? YES.

3. Do you believe he needs to frequently rest, recline, or nap throughout the day due to his medical condition? YES.

4. Do you believe he needs the assistance of a cane to ambulate? YES. This is ESSENTIAL for him.

5. Do you believe if he had to work he would more than likely miss at least three days of work a month due to his medical condition? YES.

6. Do you believe he has been unable to work 8 hours a day, 5 days a week on a regular and continuing basis since May 2009 when he exacerbated his back condition? YES.

(Tr. 616–17.)

### B. Wilke's Testimony

On February 28, 2011, Wilke responded to interrogatories from the SSA Office of Hearings and Appeals. (Tr. 214–22.) In his answers, Wilke stated he was able to take short driving trips around town, go to the grocery store with this girlfriend, use a cart for ambulation at the grocery store, do physical therapy exercises for one and a half hours each day in short intervals, and watch sports shows on television throughout the day. (Tr. 219–20.) Wilke also stated he could take a shower and do dishes in short intervals. (Tr. 220.)

On April 7, 2011, the ALJ held an administrative hearing and examined Wilke. (Tr. 44–65.) During the examination, Wilke testified that he lived with his fiancee and her 19-year-old son. (Tr. 46–47.) On a typical day, Wilke took care of his personal hygiene needs, washed dishes, watched television, played cards, and performed physical therapy exercises. (Tr. 63–64.) Plaintiff estimated that he could lift 10 pounds using both hands, but he found it difficult to walk, sit, or stand for more than 15 minutes at a time. (Tr. 62– 63, 65.) Regarding his treatment by Woehrer, Wilke stated that he would always see the residents and then Woehrer would generally show up to consult with the resident. (Tr. 59.)

### C. Wilke's Arguments on Appeal

In his appeal brief, Wilke argues that the ALJ's opinion is not supported by substantial evidence because (1) the ALJ erred by failing to give Wilke's treating physician's opinion the greatest weight in formulating her RFC assessment, and (2) the ALJ improperly discounted Wilke's credibility. (Filing 14 at CM/ECF pp. 13-27; Filing 20 at CM/ECF pp. 4–13.) The Commissioner contends that the ALJ's decision is supported by substantial evidence. (Filing 19 at CM/ECF pp. 12-23.) I agree with the Commissioner.

*1. Discounting a Treating Physician's Opinion*

In determining Wilke's RFC, the ALJ did not give great weight to Wilke's treating physician. (Tr. 25, 27.) Wilke argues that the ALJ improperly dismissed his treating physician's opinion and that her reasons for doing so are not supported by substantial evidence. (Filing 14 at CM/ECF p. 14.)

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted). While "a treating physician's opinion is generally entitled to substantial weight, that opinion does not 'automatically control' in the face of other credible evidence on the record that detracts from that opinion." *Heino v. Astrue*, 578 F.3d 873, 880 (8th Cir. 2009); *see also Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is given controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence"). Indeed, "[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (Internal quotation marks omitted). However, "[w]hen an ALJ discounts a treating physician's opinion he should give 'good reasons' for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007)

In discounting Woehrer's opinion, the ALJ stated:

> The undersigned has not given weight to Dr. Woehrer's opinion. Dr. Woehrer states that she supervises residents at the VA clinic and this might explain why the file has scant reference to her. At 18f/27 claimant wanted hydrocodone and he called for Dr. Woehrer to call him back, but other than that there are few office visits. She advises him that lab work bone scan was normal in a letter at 18f/35. She saw claimant in clinic in

> December 2010 and noted "low back pain." In December 20, 2010, he told the doctor he was on his way to a funeral in Colorado and "he has to clean out the house and help his Dad get all the affairs in order. He will not be back by the first of the year." She instructed patient to return in 6 months. 18f/46. Thus, the degree of her limitations appears to be out of proportion to the objective evidence.
>
> The limitations she expressed appear to be based on reports from the claimant rather than on objective evidence. Her opinion about the number of days the claimant would miss also seems to be based on the claimant's report. Dr. Woehrer apparently is not an orthopedist; rather, it appears she supervised residents while at the VAMC. Her opinion that the claimant cannot sustain full-time work is inconsistent with physical therapy notes indicating he is making progress. Physical therapy notes dated February 2011 state that the plan for the next 20 days was to move toward discharge with self-management of symptoms by the end of the time period. (Exhibit 18F/21)[.] In February 2011, the claimant reported he was able to walk with an assistive device for at least 20 to 30 minutes at the park with his girlfriend. (Exhibit 18F/21)[.]

(Tr. 27.)

Wilke objects to the ALJ's determination that there was "scant reference" to Woehrer in the file because the record shows that Woehrer supervised seven resident physician appointments, was the sole treating physician at one appointment, acknowledged and responded to eight phone calls from Wilke, and acknowledged three appointment notes from physical therapists. (Filing 14 at CM/ECF p. 18; Filing 20 at CM/ECF pp. 9–10.) However, it was well within the ALJ's discretion to consider Woehrer's degree of involvement and her supervisory role in weighing, and ultimately discounting, Woehrer's opinion. *See, e.g., Bailey v. Astrue*, No. 4:10-0902-DGK-SSA, 2012 WL 398608, at *2 (W.D. Mo. Feb. 7, 2012) (concluding ALJ did not err in failing to give a physician's opinion more weight where the record showed that the physician only supervised and conferred with resident and attending physicians who treated claimant); *see also Navedo v. Astrue*, No. 07-30083-KPN, 2008 WL

3075271, at *5 (D. Mass. Aug. 1, 2008) (finding claimant's relationship with his treating physician "hardly different" than his relationship with non-examining physicians where his treating physician only saw him three times and on two of those visits, merely supervised other residents); 20 C.F.R. §§ 404.1527(c)(2)(ii), 416.927(c)(2)(ii) (stating ALJ will "look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered" when weighing medical opinions).

Wilke also argues, among other things, that the ALJ erred in concluding Woehrer's opinion that Wilke could not sustain full-time work was inconsistent with physical therapy notes . (Filing 14 at CM/ECF p. 21.) These February 2011 notes indicate that Wilke was making progress toward discharge from physical therapy with self-management of his symptoms within 30 days. (Tr. 27.) However, contrary to the ALJ's opinion, the notes do not show that Wilke reported he was able to walk with an assistive device for at least 20 to 30 minutes at the park with his girlfriend. (Tr. 27, 578.) Rather, they indicate that Wilke made no recent attempts to walk in the park because of the cold weather. (*Id*.) Regardless, a treating physician's opinion that a claimant cannot sustain full-time work is not entitled to deference "because it invades the province of the Commissioner to make the ultimate disability determination." *Perkins v. Astrue*, 648 F.3d 892, 898 (8th Cir. 2011). Thus, the ALJ was not required to give controlling weight to Woehrer's opinion that Wilke could not sustain full-time work.

Further, the ALJ did not dismiss Woehrer's opinion entirely. In her RFC assessment, the ALJ found that Wilke could perform sedentary work and included Wilke's need for a cane to ambulate. (Tr. 25.) The ALJ included these limitations despite Reed and Tanner's conclusions that Wilke could perform light work.[4] (Tr.

---

[4]"The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category

346, 438.) *See Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) ("In assessing [the claimant's] RFC, the ALJ determined that [the claimant] could sit for a total of six hours and stand for a total of two hours, but was limited to sedentary work. This in itself is a significant limitation, which reveals that the ALJ did give some credit to [the treating doctor's] medical opinions."); *see also Martise v. Astrue*, 641 F.3d 909, 926 (8th Cir. 2010) (quoting *Ellis*, 392 F.3d at 994). Indeed, "[i]t is the ALJ's responsibility to determine claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description" of his limitations. *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010).

In sum, I find that the ALJ did not err in discounting Woehrer's opinion. The ALJ properly explained the weight she gave to various medical opinions and gave good reasons for doing so. There is substantial evidence on the record as a whole that supports the ALJ's finding and it is consistent with the regulations and case law.

   *2.  Credibility*

Wilke argues that the ALJ did not properly assess his credibility. (Filing 14 at CM/ECF p. 25.) To evaluate whether the ALJ erred in discounting Wilke's testimony, this court follows the standard set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). In *Polaski*, the Eighth Circuit held that the ALJ must consider "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009) (citing *Polaski*, 739 F.2d at 1322). An ALJ is not required to discuss each "*Polaski* factor," as long as the ALJ "acknowledges and considers the factors before discounting a claimant's subjective complaints." *Halverson v. Astrue,* 600 F.3d 922, 932 (8th Cir.

---

when it requires a good deal of walking or standing -- the primary difference between sedentary and most light jobs." SSR 83-10.

2010) (quoting *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009)). If an ALJ explicitly discredits the claimant's testimony and gives a good reason for doing so, courts will normally defer to the ALJ's credibility determination. *Juszczyk v. Astrue,* 542 F.3d 626, 632 (8th Cir. 2008).

Although the ALJ did not specifically cite *Polaski*, the record demonstrates that she considered the *Polaski* factors before determining that Wilke's back impairment was not as severe as he claimed.[5] (Tr. 24-28.) In particular, the ALJ considered (1) Wilke's "whirlwind week" in February 2011, that included a long shopping trip to Sam's; (2) Wilke's report to his physical therapist that changes in his exercises, attitude, and coping skills had moved him toward a goal of 20% overall improvement in symptoms; (3) Wilke's daily activities, which included short driving trips around town, grocery shopping for 15-20 minutes, using a cart for ambulation, 90 minutes of physical therapy per day, watching sports on television throughout the day, and completing personal care tasks; (4) Wilke's February 2011 report that he was providing child card for his spouse's grandchildren, (5) Wilke's trip to Colorado in December 2010, to help wrap up the affairs of his deceased uncle, and (6) physical therapy notes regarding Wilke's desire to work through his current complaints rather than asking for passive modalities or choosing to cancel his appointments. (*Id.*) Although the ALJ stated it was reasonable to expect that Wilke has some degree of pain as a result of his back impairment, based on the record as a whole, the ALJ concluded Wilke's symptoms were not as severe as alleged. (Tr. 28.) Indeed, the Eighth Circuit has held that acts that are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility. *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009).

---

[5]The ALJ acknowledged that she considered evidence based on the requirements of 20 C.F.R. 404.1529 and 404.929, as well as SSRs 96-4p and 96-7p. (Tr. 24, 27.)

Reading the ALJ's opinion as a whole, I find that the ALJ considered the *Polaski* factors and provided a reasonable explanation for discounting Wilke's allegations. As such, I defer to the ALJ's credibility determination.

### III. CONCLUSION

For the reasons explained above, I find the ALJ's decision is supported by substantial evidence on the record as a whole and is not contrary to law.

Accordingly,

IT IS ORDERED that the decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g). Final judgment will be entered by separate document.

DATED this 8th day of November, 2012.

BY THE COURT:

*Richard G. Kopf*
Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.